IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

ANDERSON DIVISION

| | |
|---|---|
| Eugenia Medlock,<br><br>        Plaintiff,<br><br>v.<br><br>John Pope Jones and Moloney Securities Co., Inc.,<br><br>        Defendants. | Civil Action No.: 8:12-2611-JMC<br><br>**COMPLAINT**<br>(Jury Demand) |

NOW COMES Plaintiff Eugenia Medlock ("Medlock"), by and through its undersigned attorneys, for their Complaint against Defendants John Pope Jones ("Jones") and Moloney Securities Co., Inc. ("Moloney"), and hereby alleges:

**PARTIES**

1. Medlock is a resident of Honea Path, South Carolina, in the County of Anderson.

2. Jones is a resident of the State of Georgia and currently lives and works in Atlanta, Georgia.

3. Moloney is a Missouri Corporation, with its principal place of business in Manchester, Missouri.

**JURISDICTION AND VENUE**

4. Jurisdiction is appropriate because this matter is brought pursuant to Rule 10b-5 of the Securities Act of 1934 and 28 U.S.C. § 1332(a) because of the complete diversity of

1

citizenship of the parties and the amount in controversy exceeds Seventy-five Thousand ($75,000.00) Dollars, exclusive of interest and costs.

5. This matter is ripe for adjudication.

6. Venue is appropriate in the Anderson Division in that Medlock is a resident of Anderson County, South Carolina.

## FACTUAL ALLEGATIONS

7. Jones is a securities broker, who is registered with the Financial Industry Regulatory Authority ("FINRA").

8. Moloney is a FINRA registered securities firm.

9. Since approximately March 3, 2010, Jones has been employed by Moloney.

10. From December 2007 to February 2010, Jones was employed by First Legacy Securities, LLC ("First Legacy").

11. During Jones' employment with First Legacy, the firm was registered with FINRA.

12. First Legacy, formerly a Delaware Limited Liability Company, is no longer registered with FINRA and is deemed "Canceled-Voided" as of June 1, 2012 according to the Delaware Secretary of State.

13. From August 2003 through January 2008, Jones was employed by Jones, Byrd, & Attkisson, Inc. ("JBA").

14. During Jones' employment with JBA, the firm was registered with FINRA.

15. JBA, formerly a Georgia Corporation, is no longer registered with FINRA and was administratively dissolved on September 6, 2010 according to the Georgia Secretary of State.

16. Medlock is the widow of James Ryland Medlock ("Ryland Medlock"), who died on April 11, 2003.

17. At the time of his death Ryland Medlock had various investments which totaled approximately $1,100,000.

18. Included within his portfolio of investments were two Pacific Life variable annuities which Ryland Medlock purchased through Jones around September 1, 1998.

19. These annuities allowed Ryland Medlock to choose certain investment options ranging from low risk options to high risk options.

20. Ryland Medlock consistently chose low risk investment options for his two Pacific Life annuities.

21. Jones was living in Augusta, Georgia at the time he sold the annuities to Ryland Medlock.

22. Other than receiving premiums and other administrative fees, Jones received no other monetary benefit from Ryland Medlock's two Pacific Life annuities.

23. The annuities did not require Jones provide Ryland Medlock with any real investment advice.

24. The annuities automatically re-balanced themselves to maintain the same mix of low to mid risk investments to account for changes in the market.

25. At the time of his death, the value of the two Pacific Life Annuities accounted for approximately $260,000 of Ryland Medlock's portfolio.

26. The vast majority of Ryland Medlock's investment were maintained in other investment vehicles with which Jones had no interest or knowledge.

27. Most of these other investments were similar to the Pacific Life policies in that they were all self-managed in low risk investment options.

28. Other than about $10,000, which Ryland Medlock used "to play the stock market," all of his investments were low risk as they were intended to be utilized for his retirement and to help his family.

29. Around July 17, 2000, Ryland Medlock assisted his wife in purchasing through Jones a Pacific Life annuity similar to his own.

30. Medlock's investment in this annuity was approximately $50,000.

31. Similarly to her deceased husband's investment decision, Medlock also selected low risk investments in which to fund her annuity.

32. This decision was made on advice provided to her from her late husband.

33. Medlock's Pacific Life annuity also automatically re-balanced itself.

34. At the time Medlock purchased this annuity, she did not meet Jones.

35. Jones simply mailed the application to Medlock from Augusta, Georgia, she signed it, and she returned it to Jones by mail from Honea Path, South Carolina.

36. Medlock also had some other investment accounts at the time she purchased her Pacific Life annuity, including her retirement account, which were likewise maintained as a low risk investment.

37. Medlock intended that her investments be used to fund her retirement and assist her family.

38. Medlock does not recall if her late husband ever personally met Jones prior to his death, but the first time she remembers meeting him was at her husband's funeral in April 2003.

39. For obvious reasons, this first meeting at the funeral is not a vivid memory to Medlock.

40. The first vivid memory that Medlock has of Jones is approximately two weeks after her husband's funeral when Jones showed up at Medlock's house in Honea Path uninvited and unannounced to assist the grieving widow with the substantial investments and insurance proceeds that she has received following Ryland Medlock's death.

41. Within two months of Ryland Medlock's death, Jones convinced Medlock to bundle all of Ryland Medlock's investments and her own investments and transfer them all to Jones for management.

42. Additionally, Jones convinced Medlock to use Ryland Medlock's life insurance policies for further investments for him to manage.

43. Upon information and belief, the amount of Medlock's money which Jones managed and controlled at this time exceeded $1,000,000.

44. In addition to knowing that Medlock was grieving after the loss of her husband of more than three decades, Jones also knew that Medlock, like many traditional homemakers, solely relied on her husband to make financial and investment decisions.

45. Jones preyed on Medlock's lack of investment sophistication and knowledge.

46. In fact, Medlock made it clear to Jones that she had not prior to this time managed any of the couples finances or investments but simply received money from her husband when requested.

47. Medlock also suffers from Lupus, an autoimmune deficiency disorder, which causes distress and discomfort to the body along with fatigue and malaise.

48. Lupus makes if difficult for Medlock to process certain information or properly deal with highly stressful situations.

49. Jones was aware of the fact that Medlock suffers from Lupus and the result it has on Medlock, especially in the years right after her husband's death.

50. Finally, Jones knows that Medlock is a devout Christian and persuaded Medlock that he too is a devout Christian and was, therefore, an appropriate person to manage Medlock's investments.

51. Jones assured Medlock he would take care of her investments and finances in the way that Ryland Medlock had done and in the way that a good, Christian man would do.

52. In response to Jones, Medlock agreed to sign any documents necessary to assist Jones, although Medlock made it clear that her investments were the money she would need to live on in her retirement and that what was left at her death was to be for her two sons and their families.

53. Jones assured Medlock he understood her need for low risk investment and indicated he would continue to carry out this investment strategy that Medlock and her late husband and traditionally employed.

54. Initially, Jones did in fact employ the same investment strategy for Medlock.

55. Although unclear when it actually began after 2003, at some point Jones began to use Medlock's money in an extremely high risk way.

56. Additionally, Jones loaned himself money from Medlock's investment and convinced Medlock that such loans were appropriate.

57. Jones also placed Medlock's money in various investments which were extremely high risk, were inappropriate and unsuitable investments for Medlock under any set of circumstances.

58. Jones should have refused to place Medlock in such investments if she had asked to do so much less place her in these investment himself.

59. Jones also invested Medlock's money in a way that constituted churning of her account in unnecessary and unwarranted ways.

60. Jones also invested and loaned money in business ventures in which he, or some of his business partners, were personally involved.

61. Without any explanation as to what the investment were, Jones convinced Medlock to sign document allowing him to investment her money as set forth above.

62. Jones also invested Medlock's money as set forth above without any authorization from her from time to time.

63. Jones also charged Medlock excessive fees and commissions for some of her investments.

64. In June 2012, Medlock received a check for $594.87 which Jones indicated was the last of the approximately $1,000,000 he had been managing for her.

65. Medlock is now broke other than her Social Security income.

66.	Medlock was never provided full documentation of how her money was invested.

67.	Rarely was Medlock consulted about investments and when she was Jones misrepresented the facts of such investments.

68.	Rarely was Medlock provided information about certain securities and then such information was not explained to Medlock.

69.	Of the account statements Medlock was provided, as of October 17, 2006 her account value was $773,870.

70.	Medlock does not believe this is even a full statement of all of her investments.

71.	Medlock was told that her money was to be invested in a way that would pay her interest payments periodically without ever having to use any of the principal investments.

72.	Periodically, Medlock would in fact receive payments which helped Jones maintain the illusion he was employing the investment strategy he told Medlock he would.

73.	The first hint that something was not right with Medlock's investments came in the Fall of 2011 when Medlock asked Jones for approximately $10,000 she needed for some household expenses.

74.	Jones indicated her account did not have sufficient money for these expenses.

75.	In response, Medlock asked Jones to repay the loan he had taken from her account and which she had unwittingly approved so she could get the money she needed.

76.	Jones responded that he could not repay her the loan.

77.	Jones also re-characterized this loan as an investment by Medlock.

78.	Jones holds an advance FINRA designation that allows him to supervise other brokers.

79. At the time he was hired by Moloney, his employer placed Jones under a supervising broker within the company because there were a history of complaint against Jones by his former clients resulting in claims against him and his employers as well as complaint to various regulatory agencies.

80. Medlock had no knowledge of these claims or complaints.

81. At least one of the claims against Jones by his client has resulted in a settlement in favor of Jones' former client in the amount of $625,000.

82. There is at least one claim against Jones still pending, as well as at least one complaint to a regulatory agency.

83. In 1997 the IRS filed a tax lien against Jones for unpaid taxes, and in 1998 Jones filed personal bankruptcy.

84. None of these facts were ever revealed to Medlock.

85. Upon information and belief, Jones used Medlock's money to satisfy his own personal financial obligations, pay claims against him, and for his own personal income.

86. Medlock was never informed of Jones' desperate financial situation until she threatened to make a claim against him within the last six months to which Jones responded it would not do any good because he had no money.

87. Jones further told Medlock that others had sought claims against him and were unsuccessful because he had no money or assets to pay them.

88. Moloney did nothing to investigate abuses by Medlock or other clients by Jones prior to his employment with Moloney.

89. Other than place Jones under supervision by someone internally at Moloney, Moloney did nothing to protect Medlock and Jones' other clients after his employment in 2010.

90. The supervision of Jones internally by someone at Moloney resulted in nothing.

91. Not only was Medlock never informed of this supervision and the reasons for it, Moloney never took steps or questioned Jones investment strategy for Jones after his employment.

92. Given the amount of her portfolio at the time of her husband's death, Jones should have received interest income in the amount of $40,000 annually conservatively without ever using any of her principal.

93. Medlock received less than 10% of that interest income over the course of time that Jones has managed her money.

94. Medlock's portfolio is now valued at zero.

95. Including principal and interest, Jones has lost approximate $1,500,000 during the time Jones has managed her money.

96. Additionally, Medlock is now suffering from symptoms associated with Lupus again, although her Lupus was thought to be in remission.

97. These symptoms began recurring again last Fall when Medlock first learned the reality of her financial situation.

**FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**(Violations of Rule 10b-5 of the Securities Act of 1934)**

98. The allegations of Paragraphs 1 through 97 above are incorporated herein as though set forth in full.

99. Jones has engaged in practices and a course of business which operated as a fraud and deceit upon Medlock in purchasing and selling securities on her behalf in violation of Rule 10b-5 of the Securities Exchange Act of 1934.

100. Specifically, Jones has engaged in practices and a course of business with Medlock's investment including unlawful loans to himself, the purchase of inappropriate and unsuitable investment, churning, selling away, unauthorized sale and purchase of securities, and charging excessive and unwarranted fees and commissions.

101. Medlock entrusted her investments to Jones.

102. Jones understood Medlock's lack of investment sophistication and experience, the fact that she was grieving over the loss of her husband, that she had not previously had any real financial experience with investments, that she suffered from Lupus, that using someone who was a Christian was important to Medlock, that Ryland Medlock had always invested his money in a low risk way, that Medlock wanted to continue that strategy because the investments were intended for her to live on and for her security.

103. Jones represented that because of those factors listed in the foregoing paragraph that he would manage Medlock's money in a way consistent with those factors and that strategy.

104. The representations and omissions by Jones to Medlock about how he would invest and use her and her husband's life savings to protect her into her old age and in the event of ill health were material to Medlock's decision to allow Jones to manage and invest her money and in deciding the course of those investments.

105. Jones statements were also made knowing that Medlock would rely on them.

106. Medlock did reasonably and justifiably rely on Jones' statements.

107. Jones' statements were made with the intent to deceive, manipulate and defraud Medlock or willfully and with reckless disregard for Jones best interests.

108. Jones preyed on Medlock's lack of sophistication and her fragile state of mind and health and took advantage of her in this regard.

109. Medlock has suffered damages in the amount of approximately $1,500,000 as a direct and proximate result of the foregoing.

110. But for the foregoing misrepresentations and omissions Medlock would have earned the interest amount set forth above and still have full use of her principal for ongoing investments.

111. Moloney is responsible for the acts of its employee as well as for the fact that it has control over Jones within the meaning of the Securities Act of 1934.

112. As a direct and proximate result of the foregoing, Medlock is entitled to return of her principal, the interest she should have earned during the time Jones managed her money, for attorneys' fees, costs, and any other damages, costs and fees that this Court deems appropriate.

## FOR A SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (Fraud)

113. The allegations of Paragraphs 1 through 112 above are incorporated herein as though set forth in full.

114. Jones understood Medlock's lack of investment sophistication and experience, the fact that she was grieving over the loss of her husband, that she had not previously had any real financial experience with investments, that she suffered from Lupus, that using someone who was a Christian was important to Medlock, that Ryland Medlock had always invested his money

in a low risk way, that Medlock wanted to continue that strategy because the investments were intended for her to live on and for her security.

115.    Jones made representations that because of those factors listed in the foregoing paragraph that he would manage Medlock's money in a way consistent with those factors and that strategy.

116.    The representations and omissions by Jones to Medlock about how he did invest and use her and her husband's life savings to protect her into her old age and in the event of ill health were false.

117.    These representations and omissions were material to Medlock's decision to allow Jones to manage and invest her money and in deciding the course of those investments.

118.    Jones knew his statements were false or that he failed to provide certain material information or he recklessly disregarded the truth or falsity of such representations or omissions.

119.    Medlock, given her lack of investment knowledge, her experience, and her health had no way of knowing Jones' statements or omissions were false.

120.    Medlock justifiably relied on Jones' statements because she was rarely providing full information but was assured that her money was safe and employed in the way she thought.

121.    Medlock had no reason to think she would be provided other information and was periodically given some money to further the fraudulent scheme.

122.    Moloney is responsible for the acts of its employee.

123.     As a direct and proximate result of the foregoing fraud, Medlock is entitled to return of her principal, the interest she should have earned during the time Jones managed her

money, for punitive damages, for attorneys' fees, costs, and any other damages, costs and fees that this Court deems appropriate.

### FOR A THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS
(Negligent Misrepresentation)

124. The allegations of Paragraphs 1 through 122 above are incorporated herein as though set forth in full.

125. Jones understood Medlock's lack of investment sophistication and experience, the fact that she was grieving over the loss of her husband, that she had not previously had any real financial experience with investments, that she suffered from Lupus, that using someone who was a Christian was important to Medlock, that Ryland Medlock had always invested his money in a low risk way, that Medlock wanted to continue that strategy because the investments were intended for her to live on and for her security.

126. Jones made representations that because of those factors listed in the foregoing paragraph that he would manage Medlock's money in a way consistent with those factors and that strategy.

127. The representations and omissions by Jones to Medlock about how he did invest and use her and her husband's life savings to protect her into her old age and in the event of ill health were false.

128. Because of Jones' financial situation, as well as the fact that he would receive commissions, fees, bonuses and other monies from managing Medlock's money, he had a pecuniary interest in making the false statements he did.

129. As a FINRA registered broker with advanced FINRA credentials, Jones had a duty of care to manage Medlock's money and investments in a way consistent with her strategy and his representations.

130. Jones breached his duty of care by, including but not limited to, making unlawful loans to himself, purchasing and selling inappropriate and unsuitable investments, churning, selling away, making unauthorized sales and purchases of securities, and charging excessive and unwarranted fees and commissions.

131. Medlock, given her lack of investment knowledge, her experience, and her health had no way of knowing Jones' statements or omissions were false or that she was entitled to more information that she received.

132. Rarely did Medlock actually need any of the money, but she periodically received what amounted to money to pacify any curiosity she might have.

133. Medlock's reliance was, therefore, justified.

134. Medlock lost approximately $1,500,000 in principal and interest as a direct and proximate result of the foregoing negligent misrepresentation.

135. Moloney is responsible for the acts of its employee, Jones.

136. As a direct and proximate result of the foregoing negligent misrepresentation, Medlock is entitled to return of her principal, the interest she should have earned during the time Jones managed her money, for attorneys' fees, costs, and any other damages, costs and fees that this Court deems appropriate.

**FOR A FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**(Negligence)**

137. The allegations of Paragraphs 1 through 136 above are incorporated herein as though set forth in full.

138. As a FINRA registered broker with advanced FINRA credentials, Jones had a duty of care to manage Medlock's money and investments in a way consistent with her strategy and his representations.

139. Jones breached his duty of care by, including but not limited to, making unlawful loans to himself, purchasing and selling inappropriate and unsuitable investments, churning, selling away, making unauthorized sales and purchases of securities, and charging excessive and unwarranted fees and commissions.

140. Medlock lost approximately $1,500,000 in principal and interest as a direct and proximate result of the foregoing negligence by Jones.

141. Moloney is responsible for the negligent acts of its employee, Jones.

142. As a direct and proximate result of the foregoing negligence, Medlock is entitled to return of her principal, the interest she should have earned during the time Jones managed her money, for attorneys' fees, costs, and any other damages, costs and fees that this Court deems appropriate.

### FOR A FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
**(Breach of Fiduciary Duty)**

143. The allegations of Paragraphs 1 through 142 above are incorporated herein as though set forth in full.

144. Given the relationship between Jones and Medlock and the fact that Medlock holds himself out as FINRA registered broker with special training, knowledge and experience, a fiduciary relationship exists between Medlock and Jones.

145. Additionally, as the supervising broker for Jones, Moloney likewise has a fiduciary relationship with Medlock.

146. Jones and Moloney breached their fiduciary duties to Medlock by, including but not limited to, making unlawful loans to himself, purchasing and selling inappropriate and unsuitable investments, churning, selling away, making unauthorized sales and purchases of securities, and charging excessive and unwarranted fees and commissions.

147. These breaches were willful, wanton, or in reckless disregard for Medlock's rights.

148. As a direct and proximate result of the breaches of these fiduciary duties approximately $1,500,000, of Medlock's money is lost.  The total of her life savings, and the money she was to live off of is now wasted.

149. As a direct and proximate result of the foregoing breaches of fiduciary duties, Medlock is entitled to return of her principal, the interest she should have earned during the time Jones managed her money, for punitive damages, for attorneys' fees, costs, and any other damages, costs and fees that this Court deems appropriate.

### FOR A SIXTH CAUSE OF ACTION AGAINST MOLONEY
**(Intentional Infliction of Emotion Distress)**

150. The allegations of Paragraphs 1 through 149 set forth above are incorporated herein as though set forth in full.

151. By making unlawful loans to himself, purchasing and selling inappropriate and unsuitable investments, churning, selling away, making unauthorized sales and purchases of securities, and charging excessive and unwarranted fees and commissions, and in essences losing

Medlock's life savings, Jones intentionally or recklessly inflicted severe emotion distress on Medlock.

152. Given the special relationship between Jones and Medlock, Medlock's Lupus and Jones' knowledge of the disease, Jones was at a minimum certain or substantially certain that Medlock's Lupus would reoccur or be exasperated by his loss of her whole life savings.

153. As a grieving widow with a disabling illness, Jones' conduct was so extreme and outrageous as to exceed all possible bounds of decency, is atrocious, and utterly intolerable in a civilized community.

154. The distress caused by Jones to Medlock are so intense as to be emotional and now physical as a result of Medlock's Lupus.

155. No person should be expected to endure such emotional and physical distress.

156. As a direct and proximate result of such intentional infliction of emotional distress, Medlock is entitled to actual and punitive damages against Jones and his employer Moloney.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment for actual no less than $1,500,000, punitive damages, attorneys' fees, and any other costs which might be determined by a jury or this Court.

ALLEN JACKSON BARNES ATTORNEY AT LAW LLC

By: s/ A. Jackson Barnes
A. Jackson Barnes
Fed. I.D. No.: 6191
jack@ajbfirm.com
Post Office Box 2838

         Sumter, South Carolina 29151
         877-589-4684 Phone
         877-565-7367 Fax

         Attorneys for Eugenia Medlock

Sumter, SC
September 11, 2012